UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHRISTINA L. VERSTREATE,

                         Plaintiff                    DECISION AND ORDER

-vs-

                                             1:18-CV-00308 CJS

ANDREW M. SAUL,
Commissioner of Social Security,

                         Defendant.
_____

APPEARANCES

For the Plaintiff:          Felice A. Brodsky
                        556 South Transit Road
                        P.O. Box 557
                        Lockport, New York 14095

                        James P. Ratchford
                        1231 Delaware Avenue
                        Suite 103
                        Buffalo, New York 14209

For the Defendant:      June Lee Byun
                        Social Security Administration
                        Office of General Counsel
                        26 Federal Plaza, Room 3904
                        New York, New York 10278

                        Francis D. Tankard
                        Jeremiah D. Hayes
                        Social Security Administration
                        Office of General Counsel
                        601 E. 12th Street, Room 965
                        Kansas City, Missouri 64106

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Christina Verstreate ("Plaintiff") for Social Security

Disability Insurance ("SSDI") benefits.   Now before the Court is Plaintiff's motion

(Docket No. [#19]) for judgment on the pleadings and Defendant's cross-motion [#26]

for the same relief.   For the reasons discussed below, Plaintiff's application is granted,

Defendant's cross-motion is denied, and the matter is remanded for further

administrative proceedings.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this

action.   The Court will summarize the record only as necessary for purposes of this

Decision and Order.

Plaintiff claims that she became disabled on February 28, 2014. (10).[1]  Several

years prior to that, on October 7, 2010, Plaintiff went for a regular checkup with her

primary care physician, Robert Erickson, M.D. ("Erickson"). (294).   Plaintiff complained

of right hip pain, depression and fatigue, but otherwise stated that she was feeling well,

was exercising and was not taking any medication. (294).   Plaintiff was morbidly obese

but not in any distress, though she complained of "some pain in her right hip and left

knee with ambulation." (295).   Upon examination, Erickson reported that Plaintiff had a

normal gait, intact strength and full range of motion. (295).

---

[1] Unless otherwise noted, citations are to the Administrative Record. (Docket No. [#9]).

On January 24, 2011, Plaintiff was injured while working as a Certified Nurse's Aide ("CNA"). Plaintiff tripped and landed on her right arm, and subsequently experienced pain and discomfort in the right hand and wrist. (291).

On January 27, 2011, Dr. Erickson noted that Plaintiff had fallen at work and was complaining of pain in the right hand and wrist that radiated to the elbow. (297). Erickson observed that Plaintiff's hand and wrist were swollen and painful with movement, and he diagnosed "sprains & strains of wrist & hand." (298).

On February 3, 2011, Erickson reported that Plaintiff was "feeling moderately better" but was still "very tender" on the top portion of her right hand. (299).

On February 9, 2011, Erickson reported that Plaintiff had returned to work, but that the top of her right hand was still very tender. (301). Plaintiff also indicated that she had experienced an additional injury while at work when a patient grabbed her right hand. (301-302). Erickson obtained an x-ray of the right hand, which suggested a possible occult fracture. (303).

On February 15, 2011, Plaintiff was examined by orthopedic surgeon Michael T. Grant, M.D. ("Grant") upon a referral from Erickson. Grant reported that Plaintiff was complaining of pain and discomfort in her right hand and wrist, but that she "denie[d] any other problems." (291). Grant reported that Plaintiff had tenderness to palpation of the hand and wrist, but that x-rays showed no fracture or dislocation. Grant diagnosed a sprain of the hand and wrist and advised Plaintiff to use ice and a splint. (293). Grant saw Plaintiff for follow-up visits, on March 1, 2011, March 22, 2011 and April 21, 2011, at each of which Plaintiff continued to complain of pain in her wrist. (288). During this

period Plaintiff attended physical therapy and took Tylenol for pain. (286, 288). Grant observed continuing tenderness and "mild motion deficits" in Plaintiff's hand and fingers. (286, 288). Grant further observed that an MRI study suggested the "possibility of an injury at the TFCC ["triangular fibrocartilage complex"]. (286). Because of Plaintiff's "slow progress and radiographic findings [concerning a possible TFCC injury]," Grant referred Plaintiff to "Dr. Marc Tetro [("Tetro")] for his opinion on how to further optimize [Plaintiff's] care." (286).

On May 3, 2011, Plaintiff reported that she had been terminated from her employment as of April 25, 2011. (323, 325).

On May 10, 2011, Tetro noted that Plaintiff was continuing to complain of symptoms in the wright hand and wrist, and that her "symptoms [were] worsened/aggravated by gripping and grasping." (410). Tetro stated that Plaintiff's symptoms were "constant over time" and involved "neurologic symptoms including paresthesias, weakness and numbness." (410).

On August 30, 2011, Plaintiff saw Erickson for a follow-up visit, at which time she complained of "feeling the same" with regard to her hand/wrist injury. (307). Plaintiff complained of continuing tenderness on top of the hand, with radiating pain and related sleep disturbance. (307). Erickson reported that Plaintiff had weak grip strength in the right hand, and that the hand was still painful to palpation. (307).

On September 27, 2011, Tetro reported that Plaintiff's right wrist was not recovering as it should, and that surgery was indicated. In that regard, Tetro stated: "Her neurologic symptoms appear to be predominantly in the ulnar nerve distribution

less so than the median nerve distribution. Recent carpal tunnel corticosteroid injection offered absolutely no improvement or relief of neurologic symptoms. . . . Christina has undergone extensive conservative treatment but unfortunately has failed to improve over time. Her pain and discomfort [are] symptomatic and problematic and she would like to proceed with a definitive long-term solution." (381-384).

On September 30, 2011, Plaintiff went to Erickson complaining of low back pain, which she attributed to a fall several weeks earlier. (309). Plaintiff reported moderate pain that radiated into her hips. (309). Erickson reported that Plaintiff had normal posture and a normal gait, but that she had tenderness at the left sacroiliac joint. (310).

On November 9, 2011, Erickson examined Plaintiff and reported essentially normal findings, except for diminished strength in the right upper extremity and pain with movement in the right arm. (312). Otherwise, Erickson noted that Plaintiff had normal posture, full strength and range of movement in the upper left extremity, and full strength and range of movement in the lower extremities. (312). Erickson did not mention any problems with Plaintiff's back. (312).

On November 10, 2011, Tetro performed surgery on Plaintiff's right arm, consisting of "right wrist arthroscopy with debridement of TFCC and lunotriquetral ligaments followed by open ulnar sided reconstruction including repair radioulnar/DRUJ and ulnocarpal collateral ligaments combined with right endoscopic CTR surgery." (349).

On March 29, 2012, Tetro reported that Plaintiff was "slowly and gradually improving" following her surgery, though she continued to have "some ulnar-sided wrist

discomfort." (354). Tetro further reported that Plaintiff had right-wrist carpal tunnel syndrome that had been established by "nerve conduction study and positive clinical exam," and he opined that the carpal tunnel problem was caused by Plaintiff's fall on January 24, 2011. (357). Regarding Plaintiff's work limitations, Tetro stated: "No repetitive gripping/grasping right hand. No lifting greater than 20 lbs right upper extremity." (357).

On August 15, 2012, Tetro described the problems with Plaintiff's right arm as "a right hand diffuse flexor tenosynovitis, right ring and small finger stenosing flexor tenosynovitis and right wrist sprain with possible TFCC tear, and right wrist possible but unlikely triquetrum avulsion facture – nonunion, right carpal tunnel syndrome." (349). Tetro stated that Plaintiff was continuing to have stiffness in her right wrist, which was aggravated by "repetitive gripping and grasping." (349). Tetro stated, though, that Plaintiff's symptoms overall were "improved from her preoperative level." (349). Tetro additionally stated that Plaintiff had no tenderness over the wrist, but some tenderness over two fingers. (351). Tetro indicated that Plaintiff needed to return to her daily activities and to a higher level of activity. (352). Tetro stated that Plaintiff had declined to receive additional pain injections for her two painful fingers, and that he had little else to offer her from a surgical standpoint, and that she should follow up with a pain management specialist. (352). Regarding Plaintiff's work limitations, Tetro stated: "No repetitive gripping/grasping right hand. No lifting greater than 5 lbs right upper extremity." (352). Tetro further indicated, though, that he considered Plaintiff to have only a "moderate partial temporary disability," and that he considered her to be capable

of "light duty" work. (352).   This was Plaintiff's last visit to Tetro.

On December 24, 2012 (approximately one year after her surgery), Plaintiff was examined by Eugene Gosy, M.D. ("Gosy"), a neurologist and pain specialist. (417). Gosy reported that Plaintiff was continuing to have "chronic pain in the right arm associated with neuropathic numbness, tingling and burning," and that "she also experiences weakness and stiffness in the right lower arm, resulting in her dropping things." (417).   Plaintiff told Gosy that she had dull and constant pain in her right hand and wrist, at the level of 6/10 on the pain scale. (417).   Gosy stated that Plaintiff was taking a combination of Norco and Lyrica, but that the medication was not controlling her pain and neuropathic symptoms "to the desired level." (418).   Gosy stated that Plaintiff had pursued "two courses of physical therapy previously without much benefit." (418).   Plaintiff reportedly told Gosy that she needed her family's help performing activities of daily living, and that she "utilize[d] the left arm for chores." (418).   Plaintiff reported that she was then a full-time student at Erie County Community College. (418). Gosy performed physical and neurological examinations of the upper and lower extremities and reported normal findings, except with regard to the right upper extremity, for which he reported decreased wrist flexion, decreased active range of motion and positive Tinel's test. (419).   Gosy's diagnosis was "reflex sympathetic dystrophy [("RSD")] of the upper limb" and "joint disorder unspec[ified] hand." (420). Gosy increased Plaintiff's dosages of Norco and Lyrica and directed Plaintiff to follow up in two months. (420).

On January 9, 2013, Plaintiff underwent a consultative examination by Mark L. Goodman, M.D. ("Goodman") in connection with a worker's compensation claim. (452). In a subsequent report dated January 18, 2013, Goodman expressed a high degree of skepticism about Plaintiff's claims and the course of treatment that had been pursued by her doctors, though he indicated that he did not have any records from Gosy. (453). Goodman observed, for example, that the objective diagnostic tests performed following Plaintiff's fall were all essentially negative, including the MRI, which he described as showing only "some mild degeneration of the TFCC ligament complex which is a normal finding in adult wrists." (453). Goodman further noted that while office notes had indicated that Plaintiff's symptoms had improved following surgery, Plaintiff "adamantly denie[d] that and [insisted] she ha[d] not improved at all since the surgery and in fact is worse now after the surgery than she was before the surgery." (453). Regarding his own examination of Plaintiff, Goodman stated that his findings did not support a diagnosis of RSD, and that Plaintiff appeared to be giving less-than-full effort when being tested:

> Examination is limited to the right wrist and hand. The claimant has no abnormality to appearance and no signs whatsoever consistent with reflex sympathetic dystrophy or complex regional pain syndrome. There is no abnormality to the color, hair formation, contractures, temperature abnormality or any evidence of allodynia; all of which are common signs of RSD when present. The claimant does have restricted motion of her wrist but this seems to be voluntary and not a mechanical block. I can measure about 30 degrees of active flexion and 30 degrees of active extension. There is no gross abnormality to appearance such as swelling, deformity, or discoloration. Drop and wipe test which measures both thermal and tactile allodynia are negative for both components which would essentially rule out complex regional pain syndrome. In addition,

measurement of her maximum forearm circumference measures 30.5 cm on the right compared to 30.5 cm on the left indicating the claimant is using the right and left arms about equally or else there would be some atrophy at this stage. Phalen's and reverse Phalen's tests cannot be tested since the claimant is unwilling to flex or extend her wrist beyond 20 to 30 degrees. I did perform a forearm compression test however which was negative for carpal tunnel syndrome. Thenar strength is weak but show some evidence of give-away weakness which is usually a sign of sub-maximal effort.

(454). Goodman opined that there was "strong evidence of submaximal effort [by Plaintiff], symptoms greater than physiological findings, non-physiological findings, and symptom magnification." (452). Goodman further opined that Plaintiff should not have been prescribed either Lyrica or Norco. (455).

On February 25, 2013, Gosy noted that Plaintiff continued to have the same symptoms, along with intermittent "sharp, shooting pain mostly at the anterolateral aspect of her arm between elbow and fingertips of the right arm." (421). Plaintiff told Gosy that the increased dosages of Norco and Lyrica were helping, and that her symptoms were "significantly improved," although she continued to have "these bothersome sensations." (422). Plaintiff denied any negative side-effects from the medications. (422). Plaintiff reported having interrupted sleep due to mechanical and neuropathic pain. (422). Plaintiff was still taking college courses full time. (422). Gosy again increased Plaintiff's dosages of Norco and Lyrica and directed her to follow up in one month. (424).

On March 25, 3013, Gosy reported that Plaintiff was continuing to have the same symptoms as before, and that in addition she was having "frequently occurring

numbness and tingling which at times are accelerated upon unexpected touch of her right upper extremity," as well as "intermittent discoloration to pale color which is limited to the right hand" and coldness of the right hand as compared to the left hand. (425-427).   Gosy reported that Plaintiff was "able to complete her activities of daily living with scheduled periods of rest, proper body mechanics and extensive help from her family members." (426).   Gosy prescribed "Amitryptyline to aid in control of [Plaintiff's] radicular and neuropathic symptoms," in addition to Norco and Lyrica. (428).

On April 22, 2013, Plaintiff reportedly told Gosy that her symptoms were more "stabilized" after taking Amitriptyline, though she still had pain 5/10. (429-430).   Gosy stated that, "[s]he finds her condition more bearable now, however, [it] still interferes with her activities of daily living.   Her symptoms are mildly improved with the immobilization of her right hand and wrist.   The pain is aggravated with activity involving her right hand." (430).   Plaintiff also reported having better sleep while taking Amitriptyline. (430).   Gosy increased the dosage of Amitriptyline and directed Plaintiff to return in two months. (432).

On June 10, 2013, Gosy reported that Plaintiff was complaining of pain 8/10, along with other longstanding symptoms consisting of "throbbing, nagging and burning pain" in her right hand and wrist. (434).   This reported increase in pain was evidently caused by the fact that Plaintiff had stopped taking her medication.   On this point, Gosy indicated that Plaintiff's medications had been discontinued on May 22, 2013, because "she failed to arrive for a pill count." (435).   Plaintiff stated that she missed the pill-count appointment due to the "death of her mother and surgery of her son." (440).   Plaintiff

reportedly stated that she had not been taking Norco regularly in any event, but was using it "on a strictly as needed and infrequent basis." (435). Gosy continued Plaintiff's prescriptions of Amitriptyline and Lyrica but declined to re-prescribe opiates until such time as Plaintiff complied with his requirements regarding pill counts and toxicology screening. (437).

On August 12, 2013, Plaintiff returned to see Gosy, again complaining of pain 8/10, along with her other symptoms of pain, numbness, tremors, discoloration, coolness and sensitivity in the right hand and wrist. (439). Gosy continued Plaintiff's prescriptions for Amitriptyline and Lyrica, but again declined to re-prescribe Norco since Plaintiff had not yet provided documentation concerning her failure to attend the previously-mentioned pill count. (440). The results of Gosy's physical and neurological examinations were normal except with regard to the right arm. (441). Specifically, Gosy found slightly decreased strength in the right upper extremity, along with decreased range of movement, mild swelling, discoloration and sensitivity to touch. (441). This was Plaintiff's last office visit with Gosy. (57, 19).[2] The Court observes that Plaintiff stopped treating with Gosy without ever having provided him with the documentation that he had requested concerning her failure to appear for the narcotic pill count. (440-441). Nonetheless, Gosy indicated that he never observed any "aberrant medication behavior" by Plaintiff, and that her toxicology tests were negative for misuse of medications. (440).

---

[2] Plaintiff indicated that she last saw Gosy when her worker's compensation claim was settled, which was shortly before Plaintiff's last visit with Gosy on August 12, 2013.

Between August 2013 and February 2014, Plaintiff was employed as an "appointment coordinator."[3]  Shortly after that employment ended, on March 18, 2014, Plaintiff applied for SSDI benefits, alleging a disability onset date of February 28, 2014, the day after she stopped working. (10).   Plaintiff claimed to be disabled due to RSD, tendonitis, carpal tunnel syndrome, "special arthritis," arthritic spurs in upper back, sacralization of vertebra in lower back, surgical hernia in stomach, bipolar disorder and anemia. (106-107).

In connection with the Social Security Administration's consideration of the claim, the SSA examiner assigned to Plaintiff's claim requested consultative medical and psychological examinations, purportedly since the evidence was "not sufficient to support a decision on the claim." (110).   The SSA examiner stated that he had not attempted to have Plaintiff's own doctor perform the consultative exam, stating: "There is no treating source to perform the CE(s).   Specific exam needed." (110; 129).   In that regard, the SSA examiner was evidently referring to the fact that when Plaintiff applied for SSDI benefits she was not seeing any particular doctor, as she had stopped seeing Gosy in August 2013 and had stopped seeing both Erickson and Tetro in 2012. (Index 2).

At around this same time, in or about June 2014, Plaintiff began seeing Nicholas Varallo, M.D. ("Varallo") as her primary care doctor. (560).   However, the record does not indicate that Varallo ever provided any treatment specifically directed at Plaintiff's

---

[3]  (472) ("She is not currently employed.   She was last employed as an appointment coordinator until 2/14 for six months, when her services were no longer needed.").

RSD.   Varallo noted that Plaintiff was morbidly obese but in no apparent distress.
(560).   Varallo noted that Plaintiff had been prescribed Amitriptyline, Flexeril and Lyrica.
(561).

On June 11, 2014, Plaintiff underwent a consultative medical examination at the
Commissioner's request by consultative examiner Samuel Balderman, M.D.
("Balderman"). (477-480).   Balderman noted that Plaintiff presented "with main medical
problem of RSD syndrome, carpal tunnel syndrome, and arthritis and tendonitis." (477).
Plaintiff reportedly told Balderman that her problems mainly involved the right arm, and
Balderman reported that "[t]he pain in the right arm is constant and moderate in
intensity.   The claimant's pain is a tightness in nature and occasionally is sharp.
Lyrica was helpful to her.   The claimant states Lyrica had to be discontinued due to
lack of funding." (477).   Plaintiff reportedly told Balderman that she had been in
"constant pain in the entire right upper extremity," "moderate" in severity, ever since the
surgery by Tetro. (477).   Plaintiff further told Balderman that she could bathe and dress
herself, but that her children performed all of the household chores. (478).   Upon
examination, Balderman stated that Plaintiff appeared to be in no acute distress, with a
limited ability to squat, but that she otherwise had a normal gait and stance. (478).
Balderman reported a normal musculoskeletal examination, with full range of movement
in the neck, back and extremities. (479).   Balderman further found "2+ edema in both
lower extremities." (479).   Balderman found no neurologic sensory deficits, and
"strength 4+/5 in the right arm and 5/5 in the left arm," as well as "strength 5/5 in both
legs," with no muscle atrophy. (479).   Additionally, Balderman reported "hand and

finger dexterity intact.   Grip strength 5/5 bilaterally." (479).   Balderman's "diagnosis" was "obesity," "status post surgery on right wrist and right carpal tunnel" and "venous insufficiency," with the latter diagnosis evidently relating to the swelling in Plaintiff's legs. (479).   Balderman's medical source statement indicated: "The claimant has mild limitation in the use of the right arm for repetitive and gross motor work.   The claimant has mild to moderate limitation in prolonged standing and prolonged sitting due to venous insufficiency and poor weight control." (480).

On June 11, 2014, Plaintiff also underwent a psychological consultative examination at the Commissioner's request, the results of which were normal except that Plaintiff was found to be "mildly limited in her ability to appropriately deal with stress.   Difficulties are caused by distractibility." (475).   The examiner further indicated, though, that Plaintiff had no limitation with regard to maintaining attention and concentration. (475).

On July 29, 2014, the SSA denied Plaintiff's claim for SSDI benefits initially. (116, 126).   Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").

On August 7, 2014, Varallo reported that he had seen Plaintiff for a "routine visit" and that she was taking her prescribed medications. (558).[4]

On December 8, 2014, Varallo noted that Plaintiff was continuing to have "backache," and that she was taking Flexeril and Amitriptyline. (555).   Varallo recommended that Plaintiff exercise and lose weight. (555).

---

[4] On September 10, 2014, Plaintiff went to a physical therapist upon a referral from Dr. Varallo, M.D. (521, 527).

On March 12, 2015, Plaintiff informed Varallo that she had been experiencing symptoms of depression for about three weeks, and that she had previously been prescribed various medications for depression. (550).   Varallo noted that Plaintiff seemed "mildly anxious," and he prescribed Lexapro and referred Plaintiff for mental health counseling. (551).

On June 8, 2015, Plaintiff saw Varallo for an office visit, at which she indicated that she had stopped taking her medications one month earlier, but wanted to resume taking them. (546).   Varallo advised Plaintiff to take her medications as prescribed. (547)

On September 10, 2015, Plaintiff saw Varallo for an annual physical. (544).   The note from that office visit does not report anything abnormal.

On March 10, 2016, Plaintiff saw Varallo for a "routine visit," and Varallo reported that Plaintiff had "stopped [taking] most of her meds." (539).

On June 9, 2016, Plaintiff told Varallo that she had been experiencing "constant" leg pain for the past two months. (537).   Varallo found no abnormalities upon examination, but he referred Plaintiff for a venous ultrasound of the leg. (538).

On September 22, 2016, Plaintiff returned to Varallo, stating that she had been having pain in her right knee for the past two weeks. (535).   Varallo noted that Plaintiff's right knee was warm, and seemed painful with movement. (535).

On October 7, 2016, Plaintiff was examined by orthopedic specialist Craig Roberto, D.O. ("Roberto") for complaints of "bilateral knee pain right greater than left." (563-564).   Plaintiff reportedly stated that she had been having knee "pain for many

years without a specific event or mechanism of injury," but that the pain had increased over the past six months. (562). Upon examination Plaintiff had an antalgic gait, mild tenderness in both knees, but full strength in both legs. (563). X-rays showed moderate to severe arthritic changes in the right knee, and moderate arthritic changes in the left knee. (563). Roberto recommended conservative treatment with physical therapy, and he administered cortisone injections. (563).

On October 25, 2016, Plaintiff was seen by Bernard Hsu, M.D. ("Hsu") for pain management. Plaintiff told Hsu that she had pain in her "neck, arms, and legs," and that her pain level was "5/10." (570). Plaintiff stated that her right hand/wrist pain had not improved following Tetro's surgery. (570). Plaintiff further stated that she was having "more problems with her left hand now," such as pins and needles and tremors. (570). Upon examination Hsu observed that Plaintiff had "mild swelling" in her right hand, but full strength in all extremities. (571). Hus's diagnoses were "complex regional pain syndrome I, unspecified," and "polyneuropathy, unspecified." (569). In this regard, Hsu clarified that the complex regional pain syndrome/RSD diagnosis pertained only to Plaintiff's right arm, while the neuropathy diagnosis pertained to the left arm. (571). In that regard, Hsu stated:

> 42-year-old woman with history of chronic right arm and wrist pain, diagnosed with reflex sympathetic dystrophy of the right upper extremity. She also has some elements of periodic neuropathy in the left hand and bilateral feet. MRI of the lumbar spine was reviewed which does not show any significant discogenic disease. The patient comes in today for consultation with pain management, as she has not been seen by a pain specialist for many years now. She is interested in any additional recommendations [for] treatment options. At this time, I feel that she may

16

benefit from adjustment of her current medication regiment for RSD[, consisting of an increase in her dosages of gabapentin and amitriptyline]. . . . I also took the liberty of starting the patient on a trial of lidocaine ointment to be applied to her right hand and wrist. There are no significant interventional treatments that I would recommend at this time that may help benefit her RSD. Follow up as needed.

(571).

On November 10, 2016, Plaintiff and her attorney representative appeared for a hearing before an Administrative Law Judge ("ALJ"). (51-105). The ALJ took testimony from Plaintiff and from a Vocational Expert ("VE"). At the time of the hearing Plaintiff was 42 years of age and had completed high school and a two-year college degree in Social Sciences and Humanities. (58). Plaintiff completed her college degree in May, 2013, after her RSD diagnosis. (58). Additionally, Plaintiff was trained and certified to work as a CNA. (58).

Plaintiff testified that her physical condition had gotten worse since her alleged onset date in February 2014. Plaintiff stated, for example, that her left arm had begun to bother her since that date, and that a doctor had told her that the left arm pain might be caused by RSD spreading from her right arm, though she had no actual diagnosis to that effect. (60).[5] Plaintiff indicated that she also had back pain, which she attributed to "sacralization of the vertebrae" and "a slightly herniated disc [as well as] arthritis," which she indicated had been diagnosed by Varallo. (61-62). (The Court does not recall such a statement in Varallo's notes, and as detailed earlier Hsu indicated that MRI testing of

---

[5] *See also*, Hearing Transcript at p. 71 ("ALJ: So he [Dr. Hsu] doesn't know what's wrong with your left hand? CLAIMANT: No, I've only seen him once so far.").

Plaintiff's lumbar spine showed no significant discogenic disease.)   Plaintiff stated that she sometimes had tremendous pain in her lower back, along with muscle spasms. (62). Plaintiff indicated that she had stopped working in February 2014 because it was "too difficult for her to function." (68).   More specifically, Plaintiff stated that her "hands didn't work like they should," which caused her to "drop things all the time," and that she became "tired" from standing and sitting. (68).   Plaintiff added, "[w]hen I sit for a long time, I have spasms.   When I stand for a long time, it bothers me." (69).   Plaintiff further indicated that she is unable to hold objects with her right hand, stating, "[W]hen I'm holding things, whether or not I want to drop it I have no control.   . . .   [M]y hand will just open up, and it will just drop things." (73).   Plaintiff clarified that she does not drop objects from her left hand (73), but indicated that she is generally unable to use her left hand since she is right-hand dominant. (74-75).   Plaintiff further indicated that Roberto had diagnosed her with arthritis in both knees, and that cortisone injections had initially been helpful but were "not helping anymore." (78). Plaintiff stated that she can sit for about thirty minutes before needing to change position, because her back becomes stiff while sitting. (81). Plaintiff stated that she can only stand for about five to ten minutes before needing to sit down. (82).   When asked about her ability to lift objects, Plaintiff stated that she can lift a gallon of milk, but sometimes has difficulty maintaining her grip. (83).   Plaintiff indicated that she can do household chores to a limited extent, but that she generally needs assistance from family members. (87-89).

At the hearing, the ALJ asked the VE to consider a hypothetical claimant who, *inter alia*, could lift and carry 20 pounds occasionally and ten pounds frequently; sit for

six hours in an 8-hour workday, and stand and/or walk for six hours in an 8-hour workday with the ability to sit for five minutes after every hour of standing and/or walking; use the left upper extremity to reach, handle and finger without limitation; and use the right upper extremity to reach, handle and finger frequently but not repetitively. (98, 100). The VE stated that such a claimant could perform the job of Appointment Clerk, DOT 920.587-1018,[6] which was one of Plaintiff's past-relevant-work jobs. (96-97). The VE stated that such a claimant could also perform the jobs of "quality assurance inspector," DOT 726.685-030, "surveillance system monitor," DOT 379.367-010 and "work order clerk," DOT 209.567-014. (98-101). The VE stated, though, that if the claimant's ability to reach was reduced to less-than-frequent, the claimant would not be able to work. (101).

On January 6, 2017, the ALJ issued a Decision denying Plaintiff's claim. (10-27). Following the familiar five-step sequential analysis used to evaluate Social Security disability claims,[7] the ALJ made these findings at the first three steps: 1) Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of February 28, 2014; 2) Plaintiff had severe impairments consisting of "reflex sympathetic dystrophy syndrome (RSD), iron deficiency, anemia, obesity, osteoarthritis of the bilateral knees, and herniated L5-S1 disc with associated facet arthritis"; and 3)

---

[6] The VE testified that this position is "sedentary, low semiskilled, SVP of 3." (97).

[7] *See, Bowen v. City of New York*, 476 U.S. 467, 470, 106 S. Ct. 2022, 2025, 90 L. Ed. 2d 462 (1986) ("Pursuant to statutory authority, the Secretary of Health and Human Services has adopted complex regulations governing eligibility for SSD and SSI payments. 20 CFR pt. 404, subpart P (1985) (SSD); 20 CFR pt. 404, pt. 416, subpart I (1985) (SSI). The regulations for both programs are essentially the same and establish a five-step "sequential evaluation" process.").

Plaintiff's impairments, singly and in combination, did not meet or medically equal a listed impairment.

Prior to reaching the fourth step of the sequential evaluation the ALJ found that Plaintiff has the following residual functional capacity ("RFC"):

> [C]laimant has the [RFC] to perform a less than full range of light work[.] Specifically, the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently; sit six hours in an eight-hour workday; and stand and or walk six hours in an eight-hour workday, alternating after one hour to siting five minutes. The claimant can occasionally balance, stoop, kneel or crouch but never crawl; and can occasionally climb ramps or stairs but never ladders, ropes or scaffolds. She can frequently reach, handle and finger with the dominant right upper extremity but can do no repetitive reaching handling or fingering with the right upper extremity.

(16). In connection with this finding the ALJ extensively reviewed and summarized the medical and non-medical evidence. (16-25). In this regard, the ALJ listed all of Plaintiff's alleged functional limitations, but found that her allegations concerning "intensity and limiting effects of her symptoms" were not strongly supported by the medical evidence. (18).

The ALJ observed that Plaintiff "allege[d] disability primarily because of RSD in her dominant right upper extremity,"[8] "as well as lower back pain due to arthritis and a disc problem." (23). The ALJ also stated that Plaintiff complained of problems with her left hand, but that there had been no true diagnosis concerning any problems with that hand. (23). With regard to Plaintiff's right hand, the ALJ observed that neither

---

[8] Plaintiff's attorney also stated in her pre-hearing brief that Plaintiff's "primary problem is RSD, which makes it difficult for her to use her right hand at all." (284).

Balderman nor Hsu had found any significant problems with Plaintiff's hand strength or dexterity. (23). The ALJ further observed that Plaintiff admittedly performed a variety of household chores and daily activities despite her alleged limitations. (24).

With respect to the medical opinion evidence, the ALJ generally gave "little weight" to the opinions of Plaintiff's treating doctors, to the extent that their office notes contained any statements regarding Plaintiff's limitations arising from RSD. The ALJ similarly indicated that she gave little weight to the consultative opinion of Goodman. In both cases, the ALJ indicated that the opinions were entitled to little weight because for the most part they were rendered substantially prior to the alleged onset date and were therefore too remote in time. (24) (referring to opinions rendered between 2011 and January 2013). However, the ALJ gave more weight to Gosy's opinion rendered in the August 2013 office note, that Plaintiff had a "50% permanent impairment," since it was "the most recent opinion from a treating source." (24). Even so, the ALJ did not give great weight to that opinion since it did not state any specific functional limitations, and since Plaintiff returned to work shortly after her last visit with Gosy. (24). The ALJ did not attempt to obtain any additional information from any of Plaintiff's former treating doctors.

The ALJ gave "substantial weight" to Balderman's consultative opinion since it was "[t]he only opinion regarding [Plaintiff's] physical functional capacity during the period beginning with the alleged onset date," and since she found it be consistent with the record as a whole, including the fact that Plaintiff returned to work between August 2013 and February 2014, until her job as a temp worker ended due to a lack of work.

(25).[9]  In that regard, the ALJ observed that Balderman "opined that the claimant has mild limitation in the use of her right arm for repetitive and gross motor work and mild to moderate limitation in prolonged standing and prolonged sitting[.]" (25).

At step four of the sequential evaluation, the ALJ found that Plaintiff could perform her past relevant work as an appointment clerk. (25).   Alternatively, the ALJ found, at step five, that there were other jobs that Plaintiff could perform, namely, jobs such as "quality assurance inspector" and "surveillance system monitor" that the VE had identified. (26).   Accordingly, the ALJ found that Plaintiff was not disabled at any time between the alleged onset date and the date of her decision. (27).

Plaintiff appealed to the Appeals Council, arguing *inter alia* that the ALJ had contradicted herself by finding that Plaintiff could use her right hand and arm to reach and grasp frequently but not repetitively. (178) ("Frequently seems to be the same as repetitive, or the ALJ would state 'constantly.'").   Plaintiff argued that the matter should be remanded for "further development of the record, and [for] clarification of the term 'repetitive.'" (179).   Plaintiff further argued that the medical evidence indicated that she could only use her hands occasionally. (178).   However, on January 4, 2018, the Appeals Council declined to review the ALJ's determination, making that determination

---

[9]  Plaintiff has offered conflicting statements explaining why she stopped working in February 2014. Plaintiff has indicated at various times that she stopped working due to her symptoms. (186, 284). However, on her Disability Report (Form SSA-3368) Plaintiff reportedly stated that she stopped working in February 2014 because her employer ran out of work for her to do. (211) ("I was working on a temp basis & the employment ran out.").   Plaintiff also reportedly told the consultative psychologist that she stopped working because the work ran out. (472) ("She was last employed as an appointment coordinator until 2/14 for six months, when her services were no longer needed."). In her memorandum of law in support of her motion for judgment on the pleadings Plaintiff combines these explanations, suggesting that Plaintiff stopped working due to the combination of those reasons. (Docket No. [#19-1] at p. 6).

the final decision of the Commissioner. (1-3).

On March 5, 2018, Plaintiff commenced this action.   On May 24, 2019, Plaintiff filed the subject motion [#19] for judgment on the pleadings.

Plaintiff contends that remand is required for essentially two reasons: First, because the ALJ failed to properly apply SSR 03-2p when evaluating Plaintiff's RSD condition; and second, because the ALJ "made up" the RFC determination and/or based the RFC determination on her own interpretation of raw medical evidence, instead of basing it upon competent medical opinion.

With regard to the first of these objections, Plaintiff maintains that even though she was not seeing a doctor for her RSD condition during the period of alleged disability,[10]  the ALJ nevertheless was required by SSR 03-2p to contact her prior treating doctors to obtain their opinions about the potential limiting effects of her RSD. Plaintiff contends that instead, the ALJ erroneously relied on the consultative opinion of Balderman, who was not a specialist in the treatment of RSD.   Plaintiff further asserts that the ALJ violated SSR 03-2p by relying on Balderman's opinion, since it did not diagnose Plaintiff as having RSD (Plaintiff contends that Balderman's opinion mischaracterized her RSD as carpal tunnel syndrome), did not fully account for all of her RSD symptoms and did not take into account the "transitory nature" of RSD symptoms. Plaintiff also maintains that the ALJ violated SSR 03-2p by failing to explore whether RSD had spread from Plaintiff's right arm to her left arm.   Plaintiff also indicates that

---

[10]  Plaintiff admits that she did not have a treating physician for her RSD during the period of alleged disability. Pl. Memo of Law [#19-1] at pp. 10, 15.

the ALJ violated SSR 03-2p by citing the lack of objective findings when evaluating Plaintiff's credibility, rather than by "making every reasonable effort" to locate other evidence that might support her complaints.   Plaintiff further contends that the ALJ should not have relied on Plaintiff's lack of specific treatment for RSD to make a negative credibility finding, since SSR 03-2p indicates that such lack of specific treatment for RSD is common.

    With regard to her second aforementioned objection, Plaintiff maintains that the ALJ formulated Plaintiff's "function-by-function" RFC without medical authority.   On this point, Plaintiff contends that Balderman's report was the only medical opinion upon which the ALJ purported to base her RFC determination.   Plaintiff argues, however, that Balderman's opinion was too vague to support the specific findings contained in the ALJ's RFC determination.   Plaintiff contends, therefore, that the ALJ made up the RFC finding "out of whole cloth," rather than basing it upon medical opinion evidence. Plaintiff further contends that in addition to being unsupported, the RFC finding is contradictory, since it indicates that Plaintiff can use her right arm and hand frequently but not repetitively.   On this point, Plaintiff suggests that the VE initially indicated that Plaintiff would be disabled if she could not use her right hand repetitively, but then changed his testimony when pressed by the ALJ.[11] Plaintiff also contends that the VE's testimony that a claimant could perform reaching frequently but not repetitively conflicts

---

[11] See, Pl. Memo of Law [#19-1] at p. 18 ("[T]he ALJ pushed a fine point and attempted to distinguish frequent from repetitive, but only after the VE said there were no jobs, which would have resulted in a favorable award of benefits to Ms. Verstreate.").   As discussed below, Plaintiff's characterization of the VE's testimony on this point is not accurate.

24

with the Dictionary of Occupational Titles ("DOT"), and that the ALJ therefore should

have had the VE explain the conflict.

 On September 20, 2019, Defendant filed the subject cross-motion [#26] for

judgment on the pleadings.   Defendant maintains that the ALJ's determination is free

from legal error and supported by substantial evidence.   Defendant preliminarily

observes that the ALJ's RFC determination was restrictive (that is, beneficial to Plaintiff)

even though the medical evidence did not strongly support Plaintiff's claimed functional

limitations:

> After her alleged onset date, Plaintiff attended an initial physical therapy
> evaluation, but was discharged due to noncompliance.   While Plaintiff
> routinely saw Dr. Varallo, Plaintiff did not receive any treatment for RSD
> between August 2013 and October 2016.   In October 2016, Dr. Hsu did
> not recommend significant interventional treatment for RSD.  . . .   In
> October 2016, Dr. Hsu observed mild swelling in Plaintiff's right hand and
> allodynia [(greater-than-expected reaction to stimulus)] along her right
> wrist and hand consistent with RSD.   However, contrary to Plaintiff's
> allegation, Dr. Hsu observed no symptoms of RSD in her left hand.   In
> fact, Plaintiff admitted at the administrative hearing that her doctor had no
> diagnosed her with RSD in her left hand.  . . .   [As for Plaintiff's back,] Dr.
> Hsu noted that the MRI showed no significant discogenic disease.   The
> ALJ also considered Plaintiff's right knee x-rays revealing moderate to
> severe osteoarthritic changes. . . .   Given how restrictive the ALJ's RFC
> was, the mere existence of some symptoms or positive findings does not
> undermine it.

Docket No. [#26-1] at pp. 15-16 (citations to record omitted).

 Defendant also observes that the ALJ "specifically stated that she considered

Plaintiff's RSD under SSR 03-2p."*Id.* at 17.[12]   As for the ALJ's alleged error in failing to

---

develop the record by contacting Plaintiff's prior treating doctors about her RSD,

Defendant states that

> Plaintiff did not seek treatment for RSD during the relevant time period. Plaintiff stopped treatment with Dr. Gosy in August 2013, six months prior to her alleged onset date. Plaintiff subsequently performed her past relevant work. As such, Dr. Gosy did not have any information relevant to Plaintiff's status during the relevant time period. [Thereafter,] Dr. Varallo routinely saw Plaintiff, but did not treat her RSD. Finally, Plaintiff visited Dr. Hsu in October 2016 for RSD, but this was an initial visit. Dr. Hsu saw Plaintiff the same number of times as Dr. Balderman. Therefore, in this case there was not a treating source to contact that was familiar with Plaintiff's RSD [during the alleged period of disability].

Docket No. [#26-1] at p. 18.

As for Plaintiff's contention that the RFC limitations were not based on medical

opinion evidence, Defendant asserts that

> these limitations are consistent with Dr. Tetro's opinion that Plaintiff could not repetitively grasp and grip. Further it is supported by Dr. Balderman's opinion that Plaintiff had mild limitations in repetitive and gross motor activities. The ALJ did not invent the limitations, but based them on the medical opinions in the record.

Docket No. [#26-1] at p. 18. Defendant further contends that "[w]hile Dr. Balderman['s

report] did not consider all of Plaintiff's impairments, the ALJ did," and the ALJ

accordingly "incorporated greater limitations into the RFC than those proposed by Dr.

Balderman."[13] Defendant points out, for example, that the ALJ included limitations on

stooping, kneeling, crouching and climbing to accommodate Plaintiff's knee pain, and

---

2p merely because the ALJ mentioned it at step three of the sequential analysis, since she did not also mention it at steps four and five.

[13] Docket No. [#26-1] at p. 19.

that she included a requirement that Plaintiff be allowed to change position from sitting to standing to accommodate Plaintiff's back pain.[14]   Additionally, Defendant asserts that the RFC finding is supported by Plaintiff's activities of daily living, including her ability to work, between August 2013 and February 2014 (after her RSD diagnosis), and her ability to complete her college degree after her RSD diagnosis.   Finally, Defendant maintains that the RFC's finding that Plaintiff can reach and handle "frequently" but not "repetitively" is not contradictory, as those terms are not synonymous.

On October 11, 2019, Plaintiff filed a reply [#27].   The Court has considered the parties' submissions and the entire record.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."   The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in

---

[14]  Docket No. [#26-1] at p. 19.

original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered. *Id.*

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019)

(internal quotation marks omitted).

Having considered Plaintiff's arguments under the foregoing standard, the Court finds that the matter should be remanded to correct a legal error by the ALJ.

<u>The ALJ failed to comply with SSR 03-2p</u>

Plaintiff contends that remand is required because the ALJ failed to follow the rules set forth in SSR 03-2p in various ways, including that she failed to seek information form Plaintiff's former treating doctors concerning any limitations that Plaintiff may have had resulting from RSD. The Court agrees that the ALJ should have sought such information.

It is of course well-settled that disability benefits proceedings are non-adversarial, and that ALJs have a general duty to develop the record in certain instances. Regarding the importance of medical evidence from treating physicians in cases involving RSD, SSR 03-2p, entitled "Titles II and XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome," states in pertinent part:

> For those cases in which the individual's impairment(s) does not meet or equal the listings, an assessment of RFC must be made, and adjudication must proceed to the fourth and, if necessary, the fifth step of the sequential evaluation process. Again, in determining RFC, all of the individual's symptoms must be considered in deciding how such symptoms may affect functional capacities. Careful consideration must be

28

given to the effects of pain and its treatment on an individual's capacity to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. See SSR 96-7p, "Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements" and SSR 96-8p, "Titles II and XVI: "Assessing Residual Functional Capacity in Initial Claims."

*Opinions from an individual's medical sources, especially treating sources, concerning the effect(s) of RSDS/CRPS on the individual's ability to function in a sustained manner in performing work activities, or in performing activities of daily living, are important in enabling adjudicators to draw conclusions about the severity of the impairment(s) and the individual's RFC. In this regard, any information a medical source is able to provide contrasting the individual's medical condition(s) and functional capacities since the alleged onset of RSDS/CRPS with the individual's status prior to the onset of RSDS/CRPS is helpful to the adjudicator in evaluating the individual's impairment(s) and the resulting functional consequences.*

Titles II & Xvi: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/complex Reg'l Pain Syndrome, SSR 03-2P (S.S.A. Oct. 20, 2003), 2003 WL 22399117 at *7 (emphasis added).

Here, the ALJ found that Plaintiff's RSD was a severe impairment.   However, there is no indication that the ALJ considered SSR 03-2p's emphasis on the need for opinions from Plaintiff's treating sources in RSD cases when evaluating the severity of that condition.   In that regard, the ALJ made no attempt to obtain additional information from Plaintiff's former treating RSD doctors.   The ALJ considered the office notes from such doctors, but to the extent that those entries contained opinions concerning Plaintiff's work limitations, the ALJ gave them little weight "because of their remoteness in time." (24).   However, "[a]lthough the timing of a treating physician's report is plainly

relevant to the ALJ's determination of the weight, if any, to give it, a treating physician's opinion need not be rejected solely because it predates the relevant time period." *Mura v. Colvin*, No. 16-CV-6159P, 2017 WL 2543939, at *5 (W.D.N.Y. June 13, 2017). Moreover, it seems that Gosy was in the best position of any medical source to provide an opinion concerning the limiting effects, if any, of Plaintiff's RSD condition, and he stopped treating Plaintiff only six months prior to her alleged disability onset date. Accordingly, the Court does not believe that Gosy's treatment relationship was so remote in time that his opinions would have been unhelpful to the ALJ, particularly since there is no indication that Plaintiff's RSD symptoms changed much during the six months after she stopped treating with Gosy.   In sum, the ALJ committed legal error which requires a remand for further administrative proceedings.

As the Court is remanding this matter for further development of the record and a new assessment of plaintiff's RFC, it declines to reach Plaintiff's remaining arguments.

CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings [#19] is granted, Defendant's motion [#26] is denied, and this matter is remanded to the Commissioner for further administrative proceedings.   The Clerk of the Court is directed to enter judgment for Plaintiff and close this action.

So Ordered.

Dated: Rochester, New York                    ENTER:
       March 16, 2020


                                              /s/ Charles J. Siragusa
                                              CHARLES J. SIRAGUSA
                                              United States District Judge